## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **SERIES 15-09-321, a designated series of MSP Recovery Claims, Series LLC, a Delaware entity,** | **COMPLAINT** |
| **Plaintiff,** | **DEMAND FOR JURY TRIAL** |
| **v.** | |
| **ZURICH AMERICAN INSURANCE COMPANY, AMERICAN GUARANTEE & LIABILITY INSURANCE COMPANY, AMERICAN ZURICH INSURANCE COMPANY, COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, EMPIRE FIRE AND MARINE INSURANCE COMPANY, EMPIRE INDEMNITY INSURANCE COMPANY, THE FIDELITY AND DEPOSIT COMPANY OF MARYLAND, STEADFAST INSURANCE COMPANY, UNIVERSAL UNDERWRITERS INSURANCE COMPANY, UNIVERSAL UNDERWRITERS OF TEXAS INSURANCE COMPANY, ZURICH AMERICAN INSURANCE COMPANY OF ILLINOIS, AND RURAL COMMUNITY INSURANCE COMPANY.** | |
| **Defendants.** | |

Plaintiff, Series 15-09-321, a designated series of MSP Recovery Claims, Series LLC, brings this action against Defendants, Zurich American Insurance Company, American Guarantee & Liability Insurance Company, American Zurich Insurance Company, Colonial American Casualty and Surety Company, Empire Fire and Marine Insurance Company, Empire Indemnity Insurance Company, The Fidelity and Deposit Company of Maryland,

Steadfast Insurance Company, Universal Underwriters Insurance Company, Universal Underwriters of Texas Insurance Company, Zurich American Insurance Company of Illinois, and Rural Community Insurance Company (collectively, "Zurich"), and alleges:

## INTRODUCTION

1.      The Medicare program spent $756 billion (roughly 12% of the entire federal budget) in fiscal year 2022 to provide health insurance for roughly 65 million people (around 20% of the U.S. population) who are aged 65 and older or have disabilities. With the aging population expected to become nearly a quarter of the U.S. population by 2060 (95 million people), one of Medicare's main trust funds is expected to run dry by 2028.[1] For these reasons, identifying and correcting fraud, waste, and abuse—and ensuring that Medicare pays only for bills Congress intended it to pay—is more important now than ever before to ensure the long-term sustainability of an essential federal program that has been in existence since 1965.

2.      More than 40 years ago, in 1980, Congress first addressed fears regarding Medicare insolvency by passing with overwhelming bipartisan support the Medicare Secondary Payer Act (the "MSP Act"). The intent of the MSP Act was to staunch the tide of ballooning medical entitlement costs. Prior to the MSP Act, Medicare paid for all medical treatment within its scope and left private insurers merely to pick up whatever expenses remained. With the MSP Act, Congress mandated that auto and premises liability insurers like Zurich—rather than Medicare—would become primarily responsible for medical expenses covered by their insurance policies.

3.      Instead of allowing insurers to accept premiums from their policyholders and then

---

[1] https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/07/fact-sheet-the-presidents-budget-extending-medicare-solvency-by-25-years-or-more-strengthening-medicare-and-lowering-health-care-costs/ (last visited November 10, 2023) ("[T]he most recent Medicare Trustees Report projected that the HI Trust Fund would be insolvent in 2028 . . . ."). The HI Trust Fund provides funding for Medicare Part A services, such as hospital stays.

sit back while Medicare paid medical bills covered by the insurers' policies, Congress mandated that the insurers would be the primary payers and Medicare would simply provide a safety net for its beneficiaries in the event the insurance carriers did not promptly pay. In short, Congress intended through the MSP Act to transfer the cost and financial burden of healthcare to private insurance plans who were receiving premiums expressly intended to cover the medical expenses being paid by Medicare prior to the MSP Act. Congress enacted section 1395y(b)(1) to reduce federal expenditures by making private automobile insurers primarily liable for the cost of servicing their policies.

4.      Subsequently, when Congress created the Medicare Advantage option under Part C of Medicare, 42 U.S.C. § 1395w-21(a)(1)(B), it ensured that Medicare Advantage Organizations ("MAOs"), just like Medicare, would be deemed the *secondary payer* when the Medicare beneficiaries' medical expenses are covered concurrently by other insurance policies. 42 U.S.C. § 1395w-22(a)(4). Medicare Part C permits Medicare beneficiaries to choose to receive their health care benefits from private insurers through MAOs. As of July 2023, over 31 million individuals— nearly 40% of all Medicare beneficiaries—had elected to enroll with an MAO and participate in a Medicare Advantage Plan ("MA Plan").[2]

5.      To protect Medicare beneficiaries, Congress authorizes both Medicare and MAOs to go ahead and pay a beneficiary's medical expenses first when a primary payer has not made or cannot reasonably be expected to make payment promptly. 42 U.S.C. § 1395y(b)(2)(B)(i). Such payments are "intended to minimize patient anxiety about the source of payment and to avoid delays in reimbursement for" medical expenses. H.R Rep. No. 97-208, pt. 2, at 956 (1981).

---

[2] Monthly Contract and Enrollment Summary Report, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/mcradvpartdenroldata/monthly-contract-and-enrollment-summary-report (last visited November 10, 2023)

However, under the MSP Act, Medicare's and the MAO's payment is conditioned on the primary payer—the insurer—ultimately reimbursing Medicare and the MAO. 42 U.S.C. § 1395y(b)(2)(B)(ii). In this way, Medicare beneficiaries receive the health care they need, but Medicare is entitled to reimbursement.

6.       When Medicare or an MAO makes a payment that a primary plan was responsible for, the payment is conditional. This rule applies any time an insurer contests liability at the time of the Medicare or MAO payment, or even where Medicare or the MAO paid for a medical expense simply because it "did not know that the other coverage existed." 42 C.F.R. § 411.21.

7.       To ensure that Medicare would be reimbursed, Congress created a cause of action for the United States government to obtain reimbursement from a primary plan. 42 U.S.C. § 1395y(b)(2)(B)(iii). When that addition proved insufficient to ensure primary payers such as insurance carriers were reimbursing Medicare, Congress enacted a private cause of action so that persons and private entities could recover conditional payments made by Medicare (and, later on, MAOs) when insurers failed to reimburse Medicare and MAOs for the payments made for expenses that were covered by their insurance policies. Congress provided for double damages so that private litigants would be incentivized to pursue recalcitrant insurers." This has become even more important as each year that passes more Medicare beneficiaries are opting for Medicare Part C.

8.       Compliance with the MSP Act should lead to tremendous savings for the Medicare program. In 2021, minimal compliance by primary payers resulted in approximately $9.7 billion in savings. However, that's just the tip of the iceberg. According to an industry white paper, approximately 8 to 10% of all healthcare expenditures are related to some type of accident.[3] When

---

[3] https://www.optum.com/content/dam/optum3/optum/en/resources/white-papers/StrengtheningPaymentIntegrity-SubrogtaionInjuryCoverageWhitePaper.pdf, p. 2 (last

a Medicare beneficiary is involved in an automobile accident, the beneficiary will almost always be insured for medical expenses either under the beneficiary's own auto insurance policy or under the policy of another driver. However, as authorized by the MSP Act, Medicare frequently ends up conditionally paying the privately covered medical expenses first. Accordingly, with expenditures over $700 billion, one should expect Medicare and MAOs to be able to recover at least something within the range of 8% of expenditures, which would amount to tens of billions of dollars. Recoveries, however, are not even remotely close to those amounts, because auto insurers have systematically disregarded their duty to comply with their obligations under the MSP Act.[4]

9.      Through years of investigation, including sending thousands of coordination of benefits letters to auto insurers across the country, Plaintiff has uncovered two strategies adopted by insurers that have contributed to the depletion of Medicare's trust funds by enabling insurers to evade their primary payer obligations. First, auto insurers, including Zurich, have done very little to identify or coordinate with MAOs who have made conditional payments, much less reimburse them. Those MAOs are ultimately funded from the same trust funds as Medicare.

10.     Second, auto insurers, including Zurich, fail to properly report to Medicare their primary payer status and related information as mandated by Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007, PL 110-173 ("Section 111"). Through Section 111, on a quarterly basis, insurers are supposed to share data with Medicare that allows Medicare to determine whether it made a secondary payment that was in fact the responsibility of another insurer—the primary payer. However, auto insurers, including Zurich, fail to gather the necessary

---

visited November 10, 2023).
[4] https://www.tucsonsentinel.com/opinion/report/043023_gonzales_medicare_op/gonzales-pursuing-more-insurance-reimbursements-would-bolster-medicare-funding/ (last visited November 10, 2023) (opinion piece by Arizona State Senator Sally Gonzales observing that the insurance industry is "costing taxpayers billions yearly and putting Medicare at risk" and the MSP Act should be vigorously enforced "so that Medicare has the funding that it needs.").

Medicare information from the injured person or act on the data contained in bills sent to insurers by healthcare providers and, therefore, do not submit the information to Medicare as mandated by Section 111. This failure is either due to insurers, including Zurich, having flawed systems and faulty data or represents a purposeful effort by them to hide the insurers' primary status from Medicare and MAOs. Without a proper Section 111 report, Medicare—and ultimately MAOs—frequently do not know that they are secondary payers and do not know who the primary payer is.

11.    The auto insurers' strategies, including those of Zurich, have harmed and will continue to harm Medicare and MAOs across the country.

12.    For that reason, this action seeks to enforce the MSP Act through the Act's private cause of action—enacted specifically to overcome insurers' resistance—by requiring Zurich to do what the MSP Act mandates: identify and reimburse conditional payments made by one of the largest MAOs in the country when Zurich was the primary payer. That MAO ("the MAO Assignor") assigned its conditional payment recovery rights to Plaintiff to bring this action.

**PARTIES, JURISDICTION, AND VENUE**

13.    Plaintiff Series 15-09-321 is a Delaware series limited liability company with a principal place of business located at 2701 S. Le Jeune Road, 10th Floor, Coral Gables, Florida 33134. Series 15-09-321 is the ultimate assignee of the MAO Assignor's rights to recovery.

14.    Zurich is an insurer that issues liability and no-fault policies, with its principal place of business at 1299 Zurich Way Schaumburg, IL 60196. At all material times, Zurich was and is authorized and licensed to transact insurance in the State of Illinois.

15.    This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1331.

16.    Venue is proper in this District pursuant to 28 U.S.C. §1391 (b), (c), and (d) because at all times material, Zurich transacted business, was found, or had agents in this District, and a

substantial portion of the alleged activity affecting trade and commerce discussed below has been carried out in this District.

17.     This Court has personal jurisdiction over Zurich because it is at home in this forum, and exercising personal jurisdiction over Zurich does not offend traditional notions of fair play and substantial justice.

## THE MEDICARE ADVANTAGE PROGRAM

18.     Medicare enrollees may elect to receive their benefits in one of two ways. First, they may receive their benefits under the traditional Medicare Parts A and B. Known as the Medicare "fee for service" option, Parts A and B provide hospital insurance and coverage for medically necessary outpatient and physician services. 42 U.S.C. § 1395w-21(a)(1)(A). Under Parts A and B, government contractors pay for Medicare enrollees' expenses directly on a fee-for-service basis. Alternatively, under Medicare Part C, Medicare enrollees may receive their Medicare benefits from private health insurers called Medicare Advantage Organizations or MAOs. 42 U.S.C. § 1395w-21(a)(1)(B).

19.     Congress enacted the Part C "Medicare Advantage" option in 1997 after experts had come to realize that the Parts A and B "fee for service" payment structure encouraged healthcare providers to order more tests and procedures than medically necessary. Through Medicare Advantage, Congress intended to "enable the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options." H.R. Rep. No. 105-217, at 585 (1997) (Conf. Rep.).

20.     Each MAO contracts individually with the Secretary of Health and Human Services. 42 U.S.C. § 1395w-27. Under that contract, the MAO receives a fixed amount per enrollee, based on the plan's enrollees' risk factors and other characteristics, rather than payment

7

of a fee for specific services performed. The MAO must then provide at least the same level of benefits that enrollees would receive under the fee-for-service Medicare Plan A and B option. *See id*. at § 1395w-22. By paying MAOs a fixed amount per enrollee—called a "capitation" payment system—Congress sought to safeguard public dollars while improving the quality of care.

21.     Under a capitation-based system, the MAO provides Medicare benefits in exchange for the fixed monthly fee per person enrolled in the program regardless of actual healthcare usage. MAOs are thus incentivized to provide health insurance more efficiently than under the fee-for-service model. Not only does the Medicare Advantage program stimulate cost savings for the Medicare Trust Fund, but it also promotes creation of additional benefits for Medicare-eligible individuals: "[C]ost savings for the Medicare Trust Fund was not Congress's only goal when it created the MA program. Congress structured the program so that MAOs would compete for enrollees based on how efficiently they could provide care to Medicare-eligible individuals." *In re Avandia*, 685 F.3d 353, 365 (3d Cir. 2012).

22.     Achievement of Congress's goals in enacting Medicare Advantage is, however, dependent on MAOs being able to achieve cost savings—like Medicare—through enforcement of the MSP Act by ensuring primary payers, such as Zurich in this case, have reimbursed the MAOs for payments of medical expenses that should have been paid by the insurers who charged and received insurance premiums specifically to cover those expenses. *Id.* at 363. When MAOs achieve cost savings by recovering conditional payments from primary payers, they can bid to cover Medicare-eligible individuals at an amount lower than CMS's benchmark, which then allows CMS to deposit part of the savings into the Medicare Trust Fund. The MAOs' cost savings also allow MAOs to offer "additional benefits to enrollees not covered by traditional Medicare." *Id.* at 365. While conditional payments recovered by MAOs do not go to Medicare directly, the payments by

primary payers do reduce costs, and those savings are passed on to Medicare through reduced costs or to the beneficiaries through expanded services. *See* 42 U.S.C. § 1395w-23.

23.     Even though MAOs have parity of recovery rights with Medicare, insurers such as Zurich have—for more than two decades—continued to disregard their reimbursement obligations to MAOs. That failure, which blocks achievement of Congress' cost-saving goals, depletes the Medicare Trust Funds that support Medicare Advantage under Part C—the same funds supporting traditional Medicare under Parts A and B. 42 U.S.C. § 1395w-23(f). Consequently, Congress's mandate that Medicare shall not be the entity primarily footing the bill is still a long way from being realized. Litigation, such as this, "ensur[es] that MAOs can recover from primary payers efficiently with a private cause of action for double damages does indeed advance the goals of the MA program." *In re Avandia*, 685 F.3d at 365.

24.     This litigation seeks to reconcile, in an accurate, structured, and equitable way, claims for reimbursement Zurich has owed for years to the MAO Assignor. This litigation thus effectively implements Congress' original intent in passing the MSP Act.

## **ZURICH'S DUTIES TO REPORT PRIMARY PAYER OBLIGATIONS**

25.     Zurich is a property and casualty insurer in the business of collecting premiums in exchange for taking on the risk that they will have to pay for personal and property damage resulting from covered events. As one of the largest insurers in the world, with its parent company Zurich Insurance Group reporting a net income in 2022 of $4.6 billion,[5] Zurich offers insurance products in all 50 states that have inevitably given rise to an MSP Act obligation to repay conditional payments made by Plaintiff's MAO Assignor in those states. As a result, Zurich is

---

[5] https://www.nasdaq.com/articles/zurich-insurance-2022-business-operating-profit-rises (last visited November 10, 2023).

tasked with having the proper systems in place to be able to (a) identify Medicare beneficiaries making claims under Zurich policies and (b) properly report them to CMS under Section 111 as required by law.

26.     As relevant to this litigation, Zurich underwrites automobile liability policies that include first-party and third-party medical coverage. A first-party insurance policy refers to the policy of the injured person. A third-party insurance policy refers to the property and bodily injury policy covering the person or entity who was responsible for the automobile accident. First-party medical coverage includes Personal-Injury-Protection ("PIP") policies that are usually issued pursuant to a state no-fault statute or provide Medical Payments Coverage ("MedPay") found in a first-party policy. The first-party policy can also, and in most instances does, contain bodily injury coverage. Third-party coverage includes coverage under a third-party liability policy and coverage under the uninsured motorist and/or underinsured motorist coverage provisions of a first-party insurance policy. The uninsured motorist and underinsured motorist coverage pays for medical expenses arising out of an automobile accident that was the fault of a third party where the third party has no coverage or insufficient coverage to pay the claims of the injured party.

27.     Zurich has a primary payer obligation under the MSP Act to reimburse MAOs such as Plaintiff's MAO Assignor for medical expenses arising out of an automobile accident involving a Medicare beneficiary in three general situations involving both first-party and third-party policies:

    **(1)**    <u>**Contractual**</u>: When Zurich has a contractual obligation to pay under a first-party policy such as for PIP or MedPay;

    **(2)**    <u>**Settlement**</u>: When Zurich settled a bodily injury claim made against a third party under either a third-party liability policy or under the uninsured or underinsured motorist coverage provisions of a first-party policy; and

**(3)** **Hybrid Situations**: Where an accident renders Zurich a primary payer under both a contractual and a settlement-based obligation, such as where an auto accident gives rise to claims under both first- and third-party insurance policies.

A. **First-Party Policy Claims: First-Party Policy Medical Coverage**

28. Zurich is a primary payer when it has issued an insurance policy that provides for first-party medical coverage that pays the reasonable and necessary medical expenses that an insured (or a passenger) incurred due to injuries sustained in an accident, regardless of fault. 42 U.S.C. § 1395y(b)(2)(A). The type of first-party medical coverage varies state by state. Some states provide for mandatory PIP coverage while other states provide for mandatory or optional MedPay coverage. A few states have both PIP and MedPay available.

29. Although the precise states have changed over the years at issue, the following 12 states *currently* have no-fault statutes that mandate PIP coverage:

- **Florida**: Florida Statute § 627.736 requires a minimum of $10,000 in no-fault medical benefits per person;

- **Hawaii**: Hawaii Revised Statutes § 431:10C-103.5 requires a minimum of $10,000 in no-fault medical benefits per person;

- **Kansas**: Kansas Statutes § 40-3103 requires a minimum of $4,500 in no-fault medical benefits per person;

- **Kentucky**: Kentucky Revised Statute § 304.39-020 requires a minimum of $10,000 in no-fault medical benefits per person;

- **Massachusetts**: Massachusetts General Laws 90 § 34A requires a minimum of $8,000 in no-fault benefits per person;

- **Michigan**: Michigan Compiled Laws § 500.3107 requires mandatory no-fault coverage at an amount to be selected by the insured;

- **Minnesota**: Minnesota Statutes § 65B.44 requires a minimum of $40,000 in no-fault medical benefits per person;

- **New Jersey**: New Jersey Statutes § 39:6A-4.3 requires a minimum of $15,000 in no-fault medical benefits per person;

- **New York**: 28 Consolidated Laws of New York § 5102 requires a minimum of $50,000 in no-fault benefits per person;

- **North Dakota**: North Dakota Century Code § 26.1-41-01 requires a minimum of $30,000 in no-fault benefits per person;

- **Pennsylvania**: 75 Pennsylvania Consolidated Statutes § 1711 requires a minimum of $5,000 in no-fault medical benefits per person; and

- **Utah**: Utah Code § 31A-22-307 requires a minimum of $3,000 in no-fault benefits per person.

30.    In addition, although Oregon is not a no-fault state, it requires $15,000 per person in PIP medical benefits. O.R.S. §§ 742.520, 742.524.

31.    In the remaining states (other than Oregon) that are considered "at-fault" states because they do not have mandatory no-fault coverage, insureds in some states have the option to purchase PIP coverage or some form of medical payments coverage (such as in Arkansas, Maryland, South Dakota, Texas, Virginia, and Washington). In all other states, they may purchase MedPay, which also pays medical benefits regardless of who was at fault in the accident. MedPay is mandatory in Maine ($2,000 in medical benefits) and in New Hampshire if the New Hampshire resident purchases auto insurance, which is not mandatory ($1,000 in medical benefits). In addition, Pennsylvania allows individuals to opt out of no-fault insurance in which case the insured must purchase $5,000 in MedPay coverage.

32.    For purposes of this Complaint, "First Party Policy Claims" will refer to those instances in which the MAO Assignor made accident-related conditional payments on behalf of a Medicare beneficiary that was also an insured under a first-party policy that provided medical payments regardless of fault such as PIP or MedPay. First Party Policy Claims include instances where such payments are made for losses arising out of automobile accidents as well as other covered losses such as slip and fall accidents.

**B.** **Settlement Claims: Third-Party Bodily Injury Coverage where Zurich Settled a Liability Claim**

33.     When a Medicare beneficiary is injured in an accident that is the responsibility of a third party, Zurich may be the insurer of the third party or may be responsible under the Medicare beneficiary's own policy by virtue of uninsured or underinsured motorist bodily injury policies ("UM" and "UIM" policies). Zurich has no obligation to pay benefits under the third-party policy or the UM/UIM policies unless the third party was "at fault."

34.     Although the most common types of policies where third-party liability claims arise are bodily injury liability policies or UM/UIM policies, third-party liability policies can also include umbrella coverage, which are policies that may include coverage for medical expenses that the insured is legally obligated to pay in excess of no-fault or medical-payments coverage, bodily injury policy limits, or UM/UIM coverage. Zurich also offers insurance coverage under commercial or personal policies considered as general liability or homeowner policies.

35.     Under any of these policies, if Zurich chooses to settle the Medicare beneficiary's claims, including medical expenses, arising out of the accident for which the third party was responsible or if a judgment or arbitration award is entered in the Medicare beneficiary's favor with respect to claims covered by a Zurich policy, then Zurich is the responsible primary payer under the MSP Act.

36.     For purposes of this Complaint, "Settlement Claims" refers to those instances when the MAO Assignor made accident-related conditional payments on behalf of a Medicare beneficiary who made a claim either against a third-party liability policy or under the beneficiary's own UM/UIM coverage, and Zurich compromised that claim through a settlement, including settlements arising out of a judgment or arbitration award.

**C.** **Zurich's Obligations Once it Becomes a Primary Payer**

37.     For both "First Party Policy Claims" and "Settlement Claims," Zurich is charged with two duties under the MSP Act: (1) to report its primary payer status under Section 111, and (2) to reimburse Medicare within 60 days of making a primary payment to a provider, beneficiary, or other party, if that payment covers items or services that were previously paid for by Medicare. The primary plan "must reimburse Medicare even though it has already reimbursed the beneficiary or other party." 42 U.S.C. §§ 1395y(b)(2)(B)(ii); 42 C.F.R. § 411.24(i)(1). If Zurich fails to reimburse within 60 days, the MSP Act automatically gives rise to a right to bring an action such as this one. In conjunction with these two duties, it is also a Primary Payer's obligation to identify its beneficiaries who are simultaneously Medicare beneficiaries in order to report and reimburse in accordance with the MSP Act.

38.     Section 111 amended the MSP Act to aid Medicare in the detection of alternative sources of insurance coverage by requiring primary plans—on their own initiative—to "determine whether a claimant (including an individual whose claim is unresolved) is entitled to benefits under the program under this subchapter on any basis"—i.e., including under Medicare Advantage—and "if the claimant is determined to be so entitled," to report the claim to the Secretary. 42 U.S.C. § 1395y(b)(8)(A)-(C).

39.     In addition to an insurer's Section 111 report, the primary payer must also provide "notice about [its] primary payment responsibility and information about the underlying MSP situation" to the Medicare payer. 42 C.F.R. § 411.25.

40.     In fact, this duty to notify predates Section 111 reporting. For three decades, the Centers for Medicare and Medicaid Services ("CMS"), its predecessor agency, and its parent department have explained that Section 411.25 requires primary payers to notify Medicare when both payers provide coverage for a beneficiary's medical care. Multiple Federal Register entries

prove this is CMS's understanding of its own regulation:

- *Medicare as Secondary Payer and Medicare Recovery Against Third Parties*, 54 FR 41716-01, 41738 (Oct. 11, 1989) (creating Section 411.25, and providing: "§ 411.25 Third party payer's notice of mistaken Medicare primary payment. If a third party payer learns that HCFA has made a Medicare primary payment for services for which the third party payer has made or ought to have made primary payment, it must give HCFA notice to that effect.").

- *Medicare as Secondary Payer and Medicare Recovery Against Third Parties*, 55 Fed. Reg. 1819-01, 1820 (Jan 19, 1990) (removing "HCFA" and stating the primary plan must give notice "to the Medicare intermediary or carrier that paid the claim").

- *Medicare Program; Medicare Secondary Payment*, 59 Fed. Reg. 4285-01, 4286 (Jan. 31, 1994) (providing that "[a]s required by § 411.25(a), any third party payer that learns that a Medicare intermediary or carrier has made a Medicare primary payment . . . must give notice to that effect to the Medicare intermediary or carrier that paid the claim," and "[a] third party payer is considered to learn that Medicare has made a primary payment when the third party payer receives information that Medicare had made a primary payment, or when it receives information sufficient to draw the conclusion that Medicare has made a primary payment")

- *Medicare Program; Medicare Secondary Payer (MSP) Amendments*, 73 Fed. Reg. 9679-01, 9682 (Feb 22, 2008) ("Section 411.25(a) requires a primary payer to provide information about primary payment responsibility . . . to the entity or entities designated by CMS to receive the information.").

41.     A primary payer's duty to notify extends beyond traditional Medicare. "The MA organization will exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP regulations in subparts B through D of part 411 of this chapter." 42 C.F.R. § 422.108(f).

42.     "The notice must describe the specific situation and the circumstances (including the particular type of insurance coverage as specified in § 411.20(a)) and, if appropriate, the time period during which the insurer is primary to Medicare." 42 C.F.R. § 411.25(b).

43.     Consequently, to properly notify secondary payers under Section 411.25,, an auto insurer like Zurich must obtain certain data from the individuals making first- and third-party insurance claims. The data that must be obtained and reported includes:

- Medicare Beneficiary Information:

  - Beneficiary name, address, sex, and date of birth
  - Beneficiary health insurance claim number (i.e., Medicare beneficiary identification number or "HIC number")
  - Social security number (if known)

- Medicare Claim Information:

  - Date of accident, injury, or illness
  - Provider of service
  - Amount of Medicare payment (if known)
  - Date of service
  - Date of Medicare payment (if known)

- Insurer, Employer, or Administrator Information:

  - Policyholder name and address
  - Name and address of insurer or administrator
  - Policy identification number or other identifier
  - Individual case identifiers used by third party payer (if applicable)
  - Name and phone number of insurer or administrator contact person
  - Workers' compensation agency claim number (if applicable)
  - Court case or docket numbers (if applicable)
  - Beneficiary's attorney's name, address and phone number (if known and applicable)
  - Name, address, and phone number of employer
  - Date and amount of payment (specify whether undisputed payment, settlement of disputed claim, or judgment)
  - Whether, under the plan or insurance, payment was considered to be a primary or a secondary payment
  - Payee name and address

*Medicare Program; Medicare Secondary Payment*, 59 Fed. Reg. 4285-01, 4287 (Jan 31, 1994).

44.     While the Section 111 report might serve as indirect notice of primary payer status (if an MAO has access to the reports), under Section 411.25, it does not serve as a substitute in situations where the primary plan knows the MAO is the secondary payer, but does nothing to prevent the MAO from making erroneous payments.

45.     Furthermore, where Zurich accepts coverage under a first-party insurance policy—

such as for PIP or MedPay coverage—Zurich has what is called an Ongoing Responsibility for Medicals ("ORM"). ORM is an entity's "responsibility to pay, on an ongoing basis, for the injured party's (the Medicare beneficiary's) 'medicals' (medical care) associated with a claim. Typically, ORM only applies to no-fault and workers' compensation claims." CMS Section 111 NGHP User Guide, Chapter III: Policy Guidance, Version 7.0, Chapter 2: Introduction and Important Terms; *see also* Chapter 6: Responsible Reporting Entities § 6.3.

46.     On the other hand, when Zurich settles an accident-related claim based on third-party liability with someone entitled to Medicare benefits, it has what is called a Total Payment Obligation to the Claimant ("TPOC"). The CMS Section 111 NGHP User Guide states that a TPOC "refers to the dollar amount of a settlement, judgment, award, or other payment in addition to or apart from ORM. A TPOC generally reflects a 'one-time' or 'lump sum' settlement, judgment, award, or other payment intended to resolve or partially resolve a claim. It is the dollar amount of the total payment obligation to, or on behalf of the injured party in connection with the settlement, judgment, award, or other payment." Chapter III: Policy Guidance, Version 7.0, Chapter 2: Introduction and Important Terms (emphasis original); *see also* Chapter 6: Responsible Reporting Entities § 6.4.

47.     When Zurich has either ORM or a TPOC, it is a "Responsible Reporting Entity" or "RRE" under federal law and is required to submit a Section 111 report. To submit the report, Zurich must first query the Medicare eligibility database to determine whether the claimant is a Medicare beneficiary. CMS's Benefits Coordination & Recovery Center ("BCRC") gives reporting entities two query methods. Because of Zurich's size, it must submit requests using a "Query Input File" that will be answered in 14 days.

48.     When uploading a Query Input File with the BCRC, the query record submitted for

each claimant must contain five data elements related to the claimant: (1) Social Security Number ("SSN") or Medicare ID; (2) the first 6 characters of the claimant's last name; (3) the first initial of the claimant's first name; (4) the claimant's date of birth; and (5) the claimant's gender. Names must be submitted exactly as they appear on the individual's Social Security or Medicare card, including spaces, hyphens, and apostrophes. *Id.* at 26.

49.     These five pieces of information are *required* to determine a claimant's entitlement to Medicare benefits and *must* be gathered by Zurich for submission to the BCRC.[6] CMS requires all five of the data elements because "the matching process depends on the quality of the data submitted. It is difficult to get a match if the input data is incorrect or invalid."[7]

50.     For the BCRC to find a match in the Medicare database, there must be an exact match on either: (1) the Medicare ID or the full SSN, and three out of the four remaining fields; or (2) the partial SSN (last five digits) and all four remaining fields. Thus, when fewer than three out of the last four criteria match (i.e., first initial of the first name, first six characters of the last name, date of birth, and gender), the RRE will not receive a match even if the submitted Medicare ID or SSN in fact matches that of a Medicare beneficiary.

51.     If that claimant is indeed a Medicare beneficiary, Zurich must provide a Section 111 report to CMS "*after* the claim is resolved [by Zurich] through a settlement, judgment, award, or other payment (regardless of whether or not there is a determination or admission of liability)." 42 U.S.C. § 1395y(b)(8)(A)(ii) (emphasis added). In other words, once Zurich enters into a settlement with or makes a payment to or on behalf of a Medicare-eligible beneficiary, it must file the mandatory Section 111 report.

---

[6] *See* CMS, MMSEA Section 111 Liability Insurance (including Self-Insurance), No-Fault Insurance, and Workers' Compensation, Query File, January 09, 2023, page 23.
[7] *Id.* at 25.

52.     By making a payment on behalf of or entering into a settlement with a Medicare beneficiary in connection with the Medicare beneficiary's accident-related claim, Zurich demonstrates it is the "primary plan" as to that claim. A primary plan must reimburse Medicare or MAOs for their conditional payments when it is demonstrated that the primary plan has or had responsibility to make payment with respect to such item or service. A primary plan's responsibility for payment may be shown by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured.

## ZURICH'S FAILURE TO COMPLY WITH THE MSP ACT

53.     For numerous years, and continuing through the present, Zurich has failed to comply with its duty to gather the necessary information from the claimants to enable it to submit all the required data elements to CMS so that CMS can identify for Zurich those claimants entitled to Medicare benefits. This habitual failure results in Zurich making no Section 111 submission at all. When Zurich fails to make a Section 111 report, Medicare and MAOs do not have information they need to identify a primary payer and to seek reimbursements for conditional payments.

54.     On information and belief, Zurich tracks its compliance with Section 111 through periodic audits it conducts evaluating its success at collecting and submitting complete data sets for claimants.

55.     On information and belief, the audit reports show Zurich fails to consistently comply with Section 111. Upon further information and belief, those reports are shared with Zurich's upper management and establish Zurich's knowledge that it does not fully comply with its duty to identify Medicare beneficiaries and, as a result, fails to reimburse claims conditionally

paid by Medicare or MAOs.

56.     Zurich's failure to obtain the necessary data points to determine a claimant's Medicare eligibility, whether intentional or unintentional, results in significant under-reporting and, correspondingly, the inability of Medicare or MAOs to uncover all the instances in which Zurich owes reimbursement of conditional payments. Zurich is aware of its obligation under the MSP Act to "determine whether a claimant (including an individual whose claim is unresolved) is entitled to benefits under the program under this subchapter on any basis," 42 U.S.C. § 1395y(b)(8), and has access to the necessary data to make this determination. In fact, in most instances, Zurich has the requisite data points in its systems to make this determination and report its primary payer status pursuant to Section 111 and, to the degree it does not, it is aware of its affirmative statutory duty to obtain that information.

57.     On information and belief, Zurich fails to properly report thousands of reimbursable claims nationwide. Plaintiff compared the claims data it received from its MAO Assignor to publicly available motor vehicle accident reports to identify instances where Medicare beneficiaries appear to have been involved in crashes. Plaintiff then took that pool of beneficiaries and compared them to Section 111 reports made by Zurich. Upon completion of that comparison, there are numerous instances where, upon information and belief, it appears Zurich either completely failed to report reimbursable claims or withdrew a prematurely filed report.

## ZURICH'S FAILURE TO COORDINATE BENEFITS OR COOPERATE WITH PLAINTIFF'S ATTEMPT TO COORDINATE BENEFITS

58.     Even though Zurich, as the primary payer, bears the responsibility for coordinating benefits and identifying whether Medicare or any MAO is entitled to reimbursement of conditional payments, Plaintiff attempted, prior to bringing this lawsuit, to work with Zurich to identify conditional payments made by Plaintiff's MAO Assignor that Zurich should have reimbursed.

Plaintiff, through its servicer, sent out coordination of benefits letters via certified mail to Zurich and devoted a tremendous amount of manpower and resources to try to work with Zurich to resolve each letter. The letters related to both First Party Policy Claims and Settlement Claims.

59.     Plaintiff identified Zurich as the likely primary payer for the conditional payments reflected in these letters based on reports that Zurich made under Section 111. Plaintiff accesses the Section 111 reports through a CMS-authorized vendor called MyAbility. MyAbility's data is drawn directly from data that Zurich submitted to CMS, either itself or through a reporting vendor. Accordingly, any inaccuracy or lack of specificity in the data is attributable to Zurich.

60.     Zurich, thus far, has only responded to 36 of 60 letters, barely attaining a 50% response rate. For those letters that did get responses, Zurich either refused to provide any information that would allow the parties to coordinate benefits as the law requires, or Zurich denied that it had any responsibility based on purported legal defenses that have no basis in law or fact.

61.     For the First Party Policy Claims, Plaintiff attempted to coordinate benefits for 16 instances in which Zurich reported under Section 111 having made a payment based on the existence of a first-party insurance policy. Those claims corresponded with payments made by Plaintiff's MAO Assignor on behalf of Medicare beneficiaries that resided in 5 different states. The states with the number of claims made in each are as follows:

| FIRST PARTY CLAIMS | |
|---|---|
| State | Count |
| NY | 11 |
| FL | 2 |
| CO | 1 |
| CT | 1 |
| OH | 1 |

62.     For the Settlement Claims, Plaintiff attempted to coordinate benefits for 44

instances in which Zurich acknowledged in a Section 111 filing that it had entered into a settlement with a Medicare beneficiary enrolled with the MAO Assignor under a third-party insurance policy or UM/UIM. Those claims corresponded with payments made by Plaintiff's MAO Assignor on behalf of Medicare beneficiaries that resided in 19 different states. The top 5 states with their total number of beneficiaries are as follows:

| THIRD PARTY CLAIMS | |
|---|---|
| State | Count |
| FL | 8 |
| GA | 5 |
| TX | 4 |
| NY | 3 |
| NJ | 3 |

63.     Plaintiff has devoted significant resources in its attempt to coordinate benefits with Zurich and to avoid litigation. Plaintiff has no choice but to bring this action because its comprehensive and exhaustive efforts to coordinate and work with Zurich outside of litigation have been unsuccessful. In fact, in its responses to Plaintiff's correspondence, Zurich has habitually stonewalled Plaintiff's effort to coordinate benefits with improper defenses to properly compensable claims. The table below summarizes Zurich's responses to Plaintiff's efforts to coordinate benefits.

| Response Type | Count |
|---|---|
| Requesting MSP Assignment of Recovery Rights | 32 |
| Contesting MSP Assignment & Failed to Provide Assignment of Benefits | 30 |
| Third Party Insurer Did Not Accept Liability | 6 |
| Confirmed Settlement | 4 |
| Contesting Statute of Limitations Defense | 3 |
| Disclosed Beneficiary Attorney | 3 |
| Member Not Covered | 2 |
| Contact Attorney Only | 2 |

| Exhaustion | 1 |
|---|---|
| Contesting Lack of Attached Itemized Bill | 1 |
| Provided CMS Information | 1 |
| Received Response to MSP Demand | 1 |
| Subrogation (Paid Lien) | 1 |

64.     Zurich also refused to share any data with Plaintiff for the purpose of identifying situations where Zurich was a primary payer but did not submit a Section 111 report—a process that numerous other carriers have agreed to explore outside of litigation. Zurich's actions in refusing to coordinate benefits are purposeful and designed to continue to conceal details of its primary payer responsibility when it has failed to submit a Section 111 report.

65.     Through this action, Plaintiff seeks to identify all instances in which Zurich had a primary payer responsibility to reimburse accident-related conditional payments made by the Plaintiff's MAO Assignor. The most efficient and fair way to quantify those damages is through a process that resembles what several other carriers are already doing voluntarily. To identify undetected claims for primary payers *other than* Zurich, Plaintiff has engaged in data sharing exercises with those other primary payers, who are also property and casualty insurers, in which the parties match data to identify all the instances in which an MAO made payments that overlap with a first- or third-party claim made by a Medicare beneficiary enrolled with the MAO. This process uses matching techniques that compensate for missing data and data imperfections and is consistent with Congress's intention in enacting the MSP Act to ensure that Medicare and, ultimately, MAOs (Part C plans) are repaid in *all instances* where an insurer is primary.[8]

---

[8] *See, e.g.,* **(1) Allstate Insurance Company** (*MSPA Claims 1, LLC v. Allstate Ins. Co.*, Case No. 1:17-cv-01340, D.E. 169 (N.D. Ill. Mar. 8, 2022)) (no-fault settlement exploration through data sharing); *MSP Recovery Claims 1, LLC v. Allstate Ins. Co.*, Case No. 20-cv-24140 at Dkt. No. 70 (S.D. Fla. 2020)) (bodily injury settlement exploration through data sharing), **(2) Auto-Owners Insurance Company** (*MSP Recovery Claims, Series LLC v. Auto-Owners Ins. Co.*, Case No. 17-cv-23841 at Dkt. No. 143 (S.D. Fla. 2022)) (settlement exploration through data sharing and noting

**STANDING ALLEGATIONS**

A.     **Assignment Allegations**

66.     Plaintiff has the legal right to pursue its MSP Act claim pursuant to a valid assignment agreement.[9]

67.     On December 23, 2021, Plaintiff's MAO Assignor entered into a Claims Assignment Agreement with Plaintiff Series 15-09-321, whereby the MAO Assignor irrevocably assigned all rights to recover payments made on behalf of its members/enrollees to Plaintiff (the "2021 Assignment Agreement"). The 2021 Assignment Agreement expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to Assignee any and all of Assignor's right, title, ownership, and interest in Medicare Advantage

---

in the joint report requesting dismissal that "[t]he parties believe that the best opportunity to finally resolve their disputes will be to continue engaging in a data matching process agreed to by the parties" and "this exercise is a reconciliation that will be handled by the parties outside of litigation"); **(3)** **National General Insurance Company** (*MSP Recovery Claims, Series LLC, et al. v. Integon Nat. Ins. Co., et al.*, Case No. 20-cv-24051, D.E. 147 (S.D. Fla. 2022)) (settlement exploration through data sharing), **(4)** **Sentry Insurance Company** *MSP Recovery Claims, Series LLC v. Dairyland Ins. Co.*, Case No. 17-cv-23983 at Dkt. No. 91 (S.D. Fla. 2020)) (no-fault and bodily injury settlement exploration through data sharing); **(5)** **Grange Insurance Company** (*MSP Recovery Claims, Series LLC v. Grange Ins. Co.*, Case No. 19-cv-219 at Dkt. No. 36 (N.D. Ohio 2019)) (noting in joint report that Grange agreed to "engage in a defined claims data matching process" to explore settlement, which resulted in a global settlement); **(6)** **Esurance Insurance Services, Inc** (*MSP Recovery Claims Series, LLC v. Esurance Property and Casualty Co.*, Case No. 20-cv-23590 at Dkt. No. 50 (S.D. Fla. 2020)) (no-fault and bodily injury settlement exploration through data sharing); **(7)** **Amica Mutual Insurance Company** (*MSP Recovery Claims, Series LLC v. Amica Mut. Ins. Co.*, Case No. 20-cv-24050, D.E. 42 (S.D. Fla. May 6, 2022)) (settlement exploration through data sharing); **(8)** **Horace Mann Insurance Company** *MSP Recovery Claims, Series LLC v. Horace Mann Ins. Co.*, Case No. 20-cv-24419, Dkt. No. 40 (S.D. Fla. July 9, 2021)) (global settlement reached based on data sharing); **(9)** **1199 SEIU National Benefit and Pension Funds** (*MSP Recovery, LLC v. 1199 SEIU Nat'l Benefit and Pension Funds*, Case No. 20-cv-1480) (global settlement reached following data sharing).

[9] A separate agreement with Plaintiff's MAO Assignor contains a provision requiring that the identity of the Assignor remain confidential. Accordingly, Plaintiff has omitted the name of its assignor from this Complaint. Should the Court deem it necessary, Plaintiff will disclose its MAO Assignor's identity, but would request that the identity be disclosed under seal pursuant to an appropriate confidentiality designation via a protective order.

> Parts A, B and C payments owed by Responsible Parties pursuant to the MSPA, by and through the following causes of action: (1) actions stemming from the MSPA, (2) breach of contract; (3) pure bills of discovery or equivalent; (4) depositions or discovery before action as set forth by Federal Rule of Civil Procedure 27; (5) subrogation; (6) declaratory action; and (7) unjust enrichment, whether known or unknown, or arising in the future (the "Claims").

2021 Assignment Agreement at 1.1.1.

68.     Consideration was exchanged by the parties in executing the 2021 Assignment Agreement and the data service agreement.

69.     The assigned "Claims" exclude claims where the MAO Assignor already recovered on the claim or is currently pursuing the claim.

70.     The MAO Assignor transferred data files to Plaintiff identifying those claims where it already had recovered money and those claims where the MAO Assignor is still pursuing recoveries. Plaintiff reviewed that list prior to filing this case and conferred with the Assignor, in an abundance of caution, to confirm that the Assignor (1) never recovered money for the non-reimbursement examples set forth below and (2) is not pursuing recoveries for the non-reimbursement examples below. Accordingly, these examples of non-reimbursement remain unpursued and unreimbursed, they are not excluded from the assignment, and Plaintiff has the legal right to pursue these claims.

71.     The claims set forth in this Complaint are not subject to any carveout, exclusion, or any other limitation in law or equity that would impair Plaintiff's right to bring the claim asserted in this case.

72.     This Complaint seeks recovery only for claims Plaintiff's MAO Assignor has assigned to Series 15-09-321. All claims at issue in this Complaint, and all claims data currently in Plaintiff's possession, were assigned to Plaintiff through the 2021 Assignment Agreement. Indeed, Plaintiff has possession of the claims data for each example of non-reimbursement

identified in this Complaint solely because Plaintiff's MAO Assignor provided that data to Plaintiff pursuant to the 2021 Assignment Agreement.

**B.    Examples of Unreimbursed First Party Policy Claims and Settlement Claims**

73.    Zurich, by failing to comply with the MSP Act and reimburse Plaintiff's MAO Assignor for conditional payments, has caused monetary injury to Plaintiff's MAO Assignor sufficient to establish a concrete injury in fact under Article III. Despite very little cooperation from Zurich, Plaintiff has identified from data transferred to it by the MAO Assignor, and further investigation, several examples of Zurich's failure to comply with its obligations under the MSP Act.

74.    Adhering to how CMS identifies instances of non-reimbursed conditional payments, Plaintiff analyzed the MAO Assignor's enrollment and claims data to identify situations where: (1) the MAO Assignor had a Medicare beneficiary enrollee injured in an accident, (2) Zurich had filed a Section 111 report regarding that enrollee, (3) the MAO Assignor made accident-related payments on behalf of that enrollee, and (4) Zurich failed to reimburse the MAO Assignor's conditional payments.

75.    Specifically, CMS uses what is reported through Section 111 to identify whether any claims that Medicare either receives or pays are related to an automobile accident. https://www.cms.gov/files/document/mmsea-111-august-7-2023-nghp-user-guide-version-73-chapter-iv-technical-information.pdf at Section 6.2.5 (last visited November 10, 2023). CMS requires the Section 111 report to contain certain codes (called International Classification of Diseases, Ninth/Tenth Revision, Clinical Modification (ICD-9/ICD-10)) that describe the "alleged illness, injury, or incident claims and/or released by the settlement, judgment, or award, or for which ORM [under a first-party coverage] is assumed." *Id*. "The ICD-9/ICD-10 codes are used by

Medicare to identify claims Medicare may receive, related to the incident, for Medicare claims payment and recovery purposes." *Id.*

76.     CMS provides to reporting entities, such as Zurich, a list of valid ICD codes, and that list can be accessed here: https://www.cms.gov/medicare/coordination-benefits-recovery-overview/icd-code-lists (last visited November 10, 2023). The list is segregated into those codes that are "valid" versus those that are "excluded." "Certain codes are not valid for No-Fault insurance types . . . because they are not related to the accident, and may result in inappropriately denied claims." *Id*. For all the examples of un-reimbursed secondary payments set forth in paragraphs 83 to 89, all the accident-related payments that the MAO Assignor made on behalf of the Medicare beneficiary fall within the list of "valid" codes that CMS itself looks at when initiating recovery. In other words, CMS, as an initial matter, would consider as accident-related all the payments set forth below that the MAO Assignor made related to the accident.

77.     Moreover, with respect to the injuries that Zurich reported under Section 111, all the injuries contained within Zurich's Section 111 reports reflect injuries that are identical, or very similar, to the injuries that resulted in health care providers providing medical items and services and thereafter billing and collecting from the MAO Assignor. CMS's manual states that it would hold Zurich responsible for reimbursing Medicare for any payments that Medicare made for same or similar injuries. https://www.cms.gov/files/document/mmsea-111-august-7-2023-nghp-user-guide-version-73-chapter-iv-technical-information.pdf at Section 6.2.5 (last visited November 10, 2023). In fact, CMS issued a training manual for reporting entities such as Zurich, stating that "ICD Diagnosis codes are also important for claims recovery" because "if [Zurich] has assumed ORM for a beneficiary's broken collar bone injury due to a no-fault policy claim, the Commercial Repayment Center (CRC) will use the submitted ICD diagnosis codes to search Medicare records

for claims paid by Medicare that are related to the case." https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/NGHP-Training-Material/Downloads/ICD-Diagnosis-Code-Requirements-Part-I.pdf at p. 7 (last visited November 10, 2023).

78. Further, according to the CMS manual: "If Medicare has made primary or conditional payment on claims related to the incident that should have been paid by other insurance, the CRC will pursue recovery from the insurer for the Medicare benefits paid." *Id*. Medicare likewise would hold Zurich accountable for reimbursing any Medicare payments for injuries that resulted in the settlement of a third-party liability claim. For example, if Zurich reported that it settled a claim involving injuries such as a sprain of the neck and a sprain of the ankle, Medicare "will use this information to search Medicare claims history," "identify any claims paid primary . . . that relate to the neck and ankle sprains," and pursue recovery. *Id*. "An exact match on the submitted ICD-9 diagnosis codes . . . is not required." *Id*. As noted above and reflected below, all the injuries that Plaintiff identified are either identical, or very similar, to what Zurich reported in its Section 111 reports.

79. Additionally, for each of the examples, Plaintiff confirmed that Zurich either acknowledged that the enrollee was covered by a Zurich policy or that Zurich had entered into a settlement with the enrollee arising out of the accident. Zurich also knew or should have known that its insured was a Medicare beneficiary and therefore had constructive knowledge of its duty to reimburse the MAO Assignor.

80. The following examples of First Party Policy Claims and Settlement Claims illustrate Zurich's failure to fulfill its statutory duties to reimburse the MAO Assignor for conditional payments when it knew that the individuals making Zurich insurance claims were also

entitled to Medicare benefits. The representative Medicare beneficiaries listed below (identified by initials for confidentiality reasons) are illustrative examples of the many claims Zurich has failed to reimburse.

81.     The scope of Plaintiff's claims is not limited to the representative Medicare beneficiaries listed below. Plaintiff's claims seek reimbursement and other relief for the thousands of conditional payments that to date remain unreimbursed by Zurich.

82.     The examples below detail the facts that demonstrate (1) the MAO Assignor made conditional payments for treatment to address injuries caused by an accident; (2) Zurich was a primary plan with respect to that accident; (3) Zurich had a demonstrated responsibility to pay or reimburse the MAO Assignor's conditional payments; and (4) Zurich did not reimburse the MAO Assignor for its conditional payments, causing the MAO Assignor to sustain damages. For each claim below, the MAO Assignor executed an assignment to Plaintiff allowing Plaintiff to pursue the specific recovery of damages; the MAO Assignor is the ultimate entity that holds the right to pursue those damages; the MAO Assignor did not retain any reimbursement rights; and Plaintiff satisfied all conditions precedent (to the extent any exist) to bring these claims.

## First-Party Policy Claims Examples

83.     G.J. was injured in an automobile accident on April 4, 2019, in New York. At that time, G.J. was enrolled in an MA Plan affiliated with Plaintiff's MAO Assignor.

     a.     At the time of the accident, G.J. was insured by a Zurich no-fault policy.

     b.     On the same date as the accident, G.J. sustained injuries to her neck, back, and knee. Treatment for those conditions was administered by providers affiliated with SeniorCare Emergency Medical Services and Long Island Jewish Medical Center.

     c.     Related follow-up treatment occurred on April 5th, 10th, and 15th, 2019.

d.    The auto accident caused the injuries set forth above.

e.    Treatment of G.J.'s neck, back, and knee injuries was reasonable and necessary.

f.    G.J.'s medical providers billed the MAO Assignor $7,100.65 for the above accident-related treatment, and the MAO Assignor paid $2,028.20 for treatment of G.J.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Zurich reported pursuant to Section 111.

g.    Zurich's Section 111 report for G.J. admits the following details about the claims:

       i.    G.J. was insured by Zurich American Insurance Company, or a subsidiary of Zurich American Insurance Company, under policy number 5096302.

      ii.    The accident caused G.J. to suffer an injury to her thorax.

    iii.    G.J.'s Medicare coverage was secondary, and G.J.'s Zurich no-fault auto insurance was primary.

    iv.    The reporting entity for the accident was Zurich American Insurance Company.

h.    On August 23, 2022, Plaintiff sent a demand letter to Zurich Insurance Group.

i.    On October 26, 2022, counsel for Zurich American Insurance Company confirmed receipt of the demand letter addressed to Zurich Insurance Group, noted that Zurich Insurance Group is a trade name and not a legal entity, and refused to respond substantively until the validity of the assignment to Plaintiff was confirmed.

84.    T.K. was injured in an automobile accident on May 8, 2018, in Florida. At that time, T.K. was enrolled in an MA Plan affiliated with Plaintiff's MAO Assignor.

a.    At the time of the accident, T.K. was a passenger in a vehicle insured by a Zurich no-fault policy.

b.    On the same date as the accident, T.K. sustained injuries to his head

and neck and received treatment for those conditions from County of Volusia Division of Emergency medical Services as well as a local radiologist.

c. The auto accident caused the injuries set forth above.

d. Treatment of T.K.'s head and neck was reasonable and necessary.

e. T.K.'s medical providers billed the MAO Assignor $959.60 for the above accident-related treatment, and the MAO Assignor paid $454.09 for treatment of T.K.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Zurich reported pursuant to Section 111.

f. Zurich's Section 111 report for T.K. admits the following details about the claims:

     i. T.K. was covered by an insurance policy with Zurich American Insurance Company, or a subsidiary of Zurich American Insurance Company, under policy number U281514.

     ii. The accident caused T.K. to suffer an injury to his head.

     iii. T.K.'s Medicare coverage was secondary, and T.K.'s Zurich no-fault auto insurance was primary.

     iv. The reporting entity for the accident was Zurich American Insurance Company.

g. On August 23, 2022, Plaintiff sent a demand letter to Zurich Insurance Group.

h. On October 27, 2022, counsel for Zurich American Insurance Company confirmed receipt of the demand letter addressed to Zurich Insurance Group, noted that Zurich Insurance Group is a trade name and not a legal entity, and refused to respond substantively until the validity of the assignment to Plaintiff was confirmed.

85. L.C. was injured in an automobile accident on November 21, 2018, in Colorado. At that time, L.C. was enrolled in an MA Plan affiliated with Plaintiff's MAO Assignor.

a. At the time of the accident, L.C. was insured by a Zurich no-fault policy.

b. The following day, L.C. received treatment for a concussion at the Swedish Medical Center. L.C. also sustained injuries to a finger and his back.

c. The auto accident caused the injuries set forth above.

d. L.C. received follow-up treatment on November 28, 2018, January 3, 2019, and January 9, 2019. Treatment of T.K.'s head, finger, and back was reasonable and necessary.

e. L.C.'s medical providers billed the MAO Assignor $5,540.00 for the above accident-related treatment, and the MAO Assignor paid $653.90 for treatment of L.C.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes.

f. Zurich's Section 111 report for L.C. admits the following details about the claims:

    i. L.C. was covered by an insurance policy with a Zurich Entity under policy number GLO9809155.[10]

    ii. L.C.'s Medicare coverage was secondary, and L.C.'s Zurich no-fault auto insurance was primary.

g. On August 23, 2022, Plaintiff sent a demand letter to Zurich Insurance Group.

h. On October 20, 2022, counsel for Zurich American Insurance Company confirmed receipt of the demand letter addressed to Zurich Insurance Group, noted that Zurich Insurance Group is a trade name and not a legal entity, and refused to respond substantively until the validity of the assignment to Plaintiff was confirmed.

### **Settlement Claims Examples**

86.　　When Zurich enters into a settlement agreement with an injured party who is enrolled in a Medicare plan, it becomes the primary payer responsible for reimbursement of medical services rendered to the injured party. After executing settlement agreements in each of the examples identified below, Zurich failed to provide actual notice of its primary payer status to

---

[10] This is the most accurate information Plaintiff can provide because the organization name was unclearly listed as only "Zurich."

the MAO Assignor that paid for the beneficiaries' medical expenses and failed to reimburse the

MAO Assignor for its conditional payments.

87.     L.A. was injured in an automobile accident on April 23, 2019, in Georgia. At that

time, L.A. was enrolled in an MA Plan affiliated with Plaintiff's MAO Assignor.

a.     The settling party was insured by a Zurich entity.[11]

b.     On the date of the accident, L.A. to suffered injuries to her left knee and left foot and she received treatment from Northeast Georgia Medical Center, among other locations.

c.     L.A. received follow-up treatment on May 2nd, 10th, and 15th, 2019.

d.     The accident caused the injuries set forth above.

e.     Treatment of L.A.'s left knee and foot was reasonable and necessary.

f.     L.A.'s medical providers billed the MAO Assignor $8,765.00 for the above accident-related treatment, and the MAO assignor paid $743.96 for treatment of L.A.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Zurich reported pursuant to Section 111.

g.     L.A. filed a third-party claim against Zurich's insured's bodily injury policy, seeking as damages reimbursement of medical expenses incurred by the MAO Assignor for the accident-related injuries set forth above.

h.     Upon information and belief, Zurich entered into a settlement with L.A., with respect to this third-party bodily injury claim, arising from the accident on April 23, 2019.

i.     Zurich's Section 111 report for L.A. admits the following details about the claims:

        i.     The settling party was an insured of a Zurich entity. According to its reporting, Zurich lists "DOL

---

[11] This is the most accurate information Plaintiff can provide because the organization name was unclearly listed as only "Zurich."

04232019" as the relevant policy and group number, however, that is likely inaccurate considering L.A.'s date of loss ("DOL") was April 23, 2019 ("04232019").

ii. The accident caused L.A. to suffer an injury to her left knee and left foot.

iii. L.A.'s Medicare coverage was secondary, and the liability insurance was primary.

j. On August 23, 2022, Plaintiff sent a demand letter to Zurich Insurance Group.

k. On October 27, 2022, counsel for Zurich American Insurance Company confirmed receipt of the demand letter addressed to Zurich Insurance Group, noted that Zurich Insurance Group is a trade name and not a legal entity, and refused to respond substantively until the validity of the assignment to Plaintiff was confirmed.

88. J.D. was injured in an accident on August 31, 2019, in Massachusetts. At that time, J.D. was enrolled in an MA Plan affiliated with Plaintiff's MAO Assignor.

a. The settling party was insured by a Zurich entity.

b. J.D. suffered injuries to his thorax, hand, and wrist. He received treatment from Advanced Berkshire Medical Imaging the day after the accident.

c. The accident caused the injuries set forth above.

d. Treatment of J.D.'s thorax, hand, and wrist was reasonable and necessary.

e. J.D.'s medical providers billed the MAO Assignor $229.00 for the above accident-related treatment, and the MAO assignor paid $18.28 for treatment of J.D.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Zurich reported pursuant to Section 111.

f. J.D. filed a third-party claim against Zurich's insured's bodily injury policy seeking as damages reimbursement of medical expenses incurred by the MAO Assignor for the accident-related injuries set forth above.

g.   Upon information and belief, Zurich entered into a settlement with J.D., with respect to this third-party bodily injury claim, arising from the accident on August 31, 2019.

h.   Zurich's Section 111 report for J.D. admits the following details about the claims:

    i.   The settling party was an insured of Zurich American Insurance Company, or a subsidiary of Zurich American Insurance Company, under policy number 189108664-001.[12]

    ii.   The accident caused J.D. to suffer an injury to her hand and wrist.

    iii.   J.D.'s Medicare coverage was secondary, and the liability insurance was primary.

i.   On August 23, 2022, Plaintiff sent a demand letter to Zurich Insurance Group.

j.   On October 20, 2022, counsel for Zurich American Insurance Company confirmed receipt of the demand letter addressed to Zurich Insurance Group, noted that Zurich Insurance Group is a trade name and not a legal entity, and refused to respond substantively until the validity of the assignment to Plaintiff was confirmed.

89.   S.F. was injured in an accident on July 29, 2018, in South Carolina. At that time, S.F. was enrolled in an MA Plan affiliated with Plaintiff's MAO Assignor.

a.   The settling party was insured by Zurich American Insurance Co, or a subsidiary of Zurich American Insurance Company.

b.   S.F. suffered injuries to her right knee. She received treatment from McLeod Regional Medical Center the day after the accident.

c.   The accident caused the injury set forth above.

d.   Treatment of S.F.'s right knee was reasonable and necessary.

e.   S.F.'s medical providers billed the MAO Assignor $1,944.00 for the above accident-related treatment, and the MAO assignor paid

---

[12] The reporting entity on the Section 111 report is "Zurich American," which Plaintiff believes is a reference to Zurich American Insurance Company.

$80.12 for treatment of S.F.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are similar to the injuries that Zurich reported pursuant to Section 111.

f.   S.F. filed a third-party claim against Zurich's insured's bodily injury policy seeking as damages reimbursement of medical expenses incurred by the MAO Assignor for the accident-related injuries set forth above.

g.   Zurich entered into a settlement with S.F., with respect to this third-party bodily injury claim, arising from the accident on July 29, 2018.

h.   Zurich's Section 111 report for S.F. admits the following details about the claims:

  i.   The settling party was an insured of Zurich American Insurance Company, or a subsidiary of Zurich American Insurance Company, under policy number 9640386209.

  ii.   The accident caused S.F. to suffer a lower leg injury.

  iii.   S.F.'s Medicare coverage was secondary, and the liability insurance was primary.

i.   On August 23, 2022, Plaintiff sent a demand letter to Zurich Insurance Group.

j.   On October 27, 2022, counsel for Zurich American Insurance Company confirmed receipt of the demand letter addressed to Zurich Insurance Group, noted that Zurich Insurance Group is a trade name and not a legal entity, and refused to respond substantively until the validity of the assignment to Plaintiff was confirmed.

90.   The cross-referencing exercise Plaintiff undertook to identify the above examples is successful in identifying some unreimbursed conditional payments. However, the bulk of those payments remain hidden without cooperation by Zurich. Since Zurich has been unwilling to comply with its Congressionally mandated obligations to determine when it is a primary plan under the MSP Act and ensure that it has reimbursed all conditional payments, this litigation is necessary

to ensure current and future compliance with the MSP Act. There can be little doubt that the examples alleged above are merely the tip of the iceberg, and that thousands of other instances exist in which Zurich has accepted premiums to cover medical expenses arising out of automobile accidents but has chosen to let Medicare and MAOs pick up the tab.

91.     Zurich's refusal to accept its Congressionally mandated obligation to reimburse MAOs' conditional payments—instead pocketing premiums charged to cover the expenses it lets the MAOs pay—has led to this lawsuit.

### ZURICH FAILED TO CONTEST THE REIMBURSEMENT CLAIM UNDER THE EXCLUSIVE ADMINISTRATIVE REVIEW PROCESS UNDER 42 U.S.C. §§ 405(G)-(H)

92.     When a party wants to dispute a claim by an MA plan, it must do so through the exclusive review process outlined in 42 U.S.C. §§ 405(g)-(h). Section 405(h) makes § 405(g), the Social Security program's judicial review provision, the sole avenue for judicial review of all claims arising under the Medicare Act.

93.     When an MAO gets billed for medical expenses incurred by its beneficiary after an injury in an accident, the MAO determines: (1) whether those expenses are covered under the health insurance policy; and, if so, (2) how much to pay. 42 C.F.R. § 422.566(b).

94.     The MAO's initial decision regarding coverage for a Medicare enrollee's medical expenses is called an "organization determination," which includes any reimbursement determination made by an MAO with respect to payment made by an MAO for Medicare covered services. 42 C.F.R. § 422.566(b)(3).

95.     If any party wishes to challenge any aspect of an organization determination, that party must exhaust its administrative remedies by following a specific procedure for administrative appeal prescribed by the Medicare Act and its implementing regulations. 42 U.S.C. § 1395w–

22(g); 42 C.F.R. §§ 422.560–422.622.

96.     Zurich failed to challenge Plaintiff and the MAO Assignor's organization determination under the administrative process in 42 U.S.C. § 405(g), and as a result, it is foreclosed from disputing the reimbursement amounts in this lawsuit, as no party timely appealed the MAO Assignor's organization determination (i.e., reimbursement determination).

97.     Thus, the amount Zurich owes is now fixed as to the universe of claims asserted in this action.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Equitable Estoppel

98.     Zurich has been under a continuous duty to identify and coordinate benefits with MAOs, including the MAO Assignor, and to provide proper notice to CMS of its primary payer status to ensure that conditional payments made on behalf of Medicare beneficiaries are reimbursed.

99.     Zurich knowingly, affirmatively, and actively concealed or recklessly disregarded its obligations to the MAO Assignor and, therefore, is estopped from relying on any statute of limitations in defense of this action.

### Fraudulent Concealment

100.    All applicable statutes of limitation have been tolled by Zurich's fraudulent concealment of its status as the primary payer for the MAO Assignor's Medicare beneficiary enrollees by: (1) intentionally failing to obtain the information needed to identify whether individuals with accident-related medical expenses covered by Zurich policies are Medicare beneficiaries enrolled in Medicare Advantage Plans, (2) failing to properly submit Section 111 reports to CMS, and (3) failing to coordinate with MAOs or their assignors in order to evade having

to reimburse conditional payments. Instead of complying with the requirements of the MSP Act and Section 111, enacted to ensure that Medicare and now MAOs are secondary payers, Zurich has intentionally and fraudulently concealed its primary payer responsibility to avoid having to reimburse conditional payments.

101.    Virtually all residents in the United States are covered under multiple policies of insurance. These policies include health, prescription, auto, and home insurance coverage. Although the enrollment process for these policies varies between carriers and policy types, certain features are common.

102.    Auto insurers, including Zurich, ask numerous questions about the insured during policy underwriting such as the policy holder's name, address, date of birth, vehicle make and model, education level, employment information, driving history, vehicle registration, license information, accident history, and whether the insured resides with individuals of driving age.

103.    Thus, when an insured makes a claim, the claim is then assigned to a claim handler to be processed through a standardized process. One of the steps in the process is to determine— for the first time—whether the claimant is Medicare eligible. Often, the claim adjuster will rely solely on responses to written forms sent to insureds, where the insureds will self-report whether they are Medicare eligible or will provide certain demographic information so the auto insurer can query Medicare's database. However, insureds are reluctant to turn over information which results in Zurich's failure to identify and reimburse payments made by Medicare Advantage Organizations.

104.    Moreover, throughout the life of a claim, the claim handler receives additional information from other third-party sources, such as examinations under oath, police records, medical bills, and the like. Zurich, however, has no process in place to extract information from

those third-party sources and use that information to either query the Medicare eligibility database or to investigate further to learn of the insured's Part C provider. This too results in missed opportunities to identify and reimburse Medicare Advantage Organizations, including the MAO Assignor in this case.

105. Zurich knows its current system is set up to result in large amounts of conditional payments being undetectable. They are undetectable because the MSP statute and implementing regulations rely on compliance by the auto insurer to make secondary payers, i.e., Medicare or MAOs, aware of the fact that someone has a primary payment responsibility. Indeed, Section 111 and 42 C.F.R. § 411.25 were specifically designed so that auto insurers come forth with information to facilitate the coordination of benefits and reimbursement of payments owed to Medicare.

106. Zurich's choice not to change its system and processes to result in accurate and complete coordination between itself and Medicare and MAOs amounts to fraudulent concealment that tolls the statute of limitations for all claims that Plaintiff or its MAO Assignor were unable to discover due to Defendant's fraud.

107. Each Zurich entity named in this Complaint may register as an RRE for itself or for any direct subsidiary in its corporate structure.[13] Further, a parent company (regardless of whether it fits the formal definition of an RRE) may register as an RRE for any subsidiary in its corporate structure.[14] On information and belief, Defendant Zurich American Insurance Company is the

---

[13] MMSEA Section 111 Liability Insurance (Including Self-Insurance), No-Fault Insurance, and Workers' Compensation User Guide, *available online at* https://www.cms.gov/medicare/coordination-of-benefits-and-recovery/mandatory-insurer-reporting-for-non-group-health-plans/nghp-training-material/ghp-training-material-items/responsible-reporting-entity (last visited November 10, 2023).

[14] MMSEA Section 111 Liability Insurance (Including Self-Insurance), No-Fault Insurance, and Workers' Compensation User Guide, *available at* https://www.cms.gov/Medicare/Coordinationof-

parent company that reports to CMS on behalf of its subsidiaries. The other entities named as alternative Defendants in this Complaint are Zurich subsidiaries and are all potentially liable to Plaintiff. These alternative Defendants were identified after reviewing Zurich American Insurance Company and Affiliates Combined Annual Statement for the year 2022.[15]

108.    As further evidence of Defendant's concealment of information, in violation of federal law, Plaintiff attempted to coordinate benefits solely on those claims that Plaintiff could identify from reports that Zurich made under Section 111. As described above and below, Plaintiff sent numerous letters to better understand whether Zurich fulfilled its obligation to reimburse Plaintiff's MAO Assignor. Instead of cooperating and providing information as the law requires, Defendants refused to provide information as discussed above.

109.    None of the reasons given by Zurich are valid reasons to refuse to provide information pursuant to Section 411.25. Instead, they reflect conduct that amounts to fraudulent concealment of information that Defendant is required to disclose and that concealment tolls the statute of limitations to the extent Plaintiff was unable to identify an actionable claim because of Zurich's conduct.

## CAUSES OF ACTION

### COUNT I
**Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A) for Settlement Claims**
**(Seeking the MAO Assignor's Unreimbursed Conditional Payments)**

110.    Plaintiff re-alleges and incorporates herein by reference each of the allegations

---

Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/NGHPTraining-Material/Downloads/Responsible-Reporting-Entity.pdf.
[15] https://www.zurich.com/-/media/project/zurich/dotcom/investor-relations/docs/financial-reports/2022/combined-annual-statement-of-zaic-2022.pdf?rev=e7e1252f12d94af0a8aa3ccef81572bf&hash=19C44BB5D5F2A286E2DA0FEB7C05A093 (last visited November 10, 2023).

contain in the preceding paragraphs 1-109 as if fully set forth herein.

111.     Plaintiff asserts a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A).

112.     Zurich was a primary plan for the Settlement Claims.

113.     Plaintiff's MAO Assignor, as part of providing Medicare benefits under the Medicare Advantage program, paid for accident-related items and services that were reasonable and necessary and which were also covered by a third-party policy that provided bodily injury coverage for accident-related medical expenses or by a first-party policy that provided UM or UIM coverage.

114.     The MAO's Medicare beneficiaries made claims against Zurich's third-party policies to recover the medical expenses the MAO Assignor paid for items and services that were reasonable, necessary, and related to an accident. Zurich entered into settlements with the MAO Assignor's beneficiaries relating to accidents but failed to reimburse the MAO Assignor for accident-related medical expenses paid by the Assignor.

115.     Zurich had a nondelegable duty to reimburse the MAO Assignor for payments it made for medical expenses related to an accident. Zurich is responsible for reimbursement of these accident-related medical expenses, even if it subsequently paid out the maximum benefits under the policies.

116.     Zurich has and had a demonstrated responsibility to reimburse accident-related secondary payments relating to the Settlement Claims but failed to do so causing Plaintiff's MAO Assignor damages. Zurich's responsibility to reimburse the MAO Assignor for its Settlement Claims conditional payments is demonstrated by the fact that Zurich entered into settlements with respect to the accidents with the MAO Assignor's enrollees.

117.     To the extent it was necessary, Zurich failed to administratively appeal the MAO

Assignor's rights to reimbursement within the administrative remedies period. Zurich, therefore, is time-barred from challenging the propriety, reasonableness, and necessity of the amounts paid.

118.  Zurich was required to timely reimburse the MAO Assignor for conditional payments of its Medicare beneficiaries' accident-related medical expenses.

119.  The MAO Assignor suffered damages as a direct result of Zurich's failure to comply with its statutory and regulatory duties under the MSP Act and the corresponding regulations within the Code of Federal Regulations.

120.  Zurich derived substantial monetary benefit by placing the burden of financing medical treatments on the MAO Assignor in violation of the MSP Act and to the detriment of the Medicare program.

121.  Plaintiff seeks to recoup only those medical items or services provided to the MAO Assignor's Medicare beneficiary enrollees that were related to motor vehicle accidents covered by Zurich's insurance policies.

122.  Plaintiff brings this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A), for reimbursement of its MAO Assignor's secondary payments and to recover statutory double damages from Zurich for its failure to make appropriate and timely reimbursement of conditional payments for Medicare beneficiaries' accident-related medical expenses.

123.  Further, due to Zurich's decision to have Zurich American Insurance Company report on behalf of subsidiaries, and other unclear reporting practices such as listing only "Zurich" as the organization name in one example above, Plaintiff alternatively brings this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A) to recover double damages from:

- American Guarantee & Liability Insurance Company;

- American Zurich Insurance Company;

- Colonial American Casualty and Surety Company;

- Empire Fire and Marine Insurance Company;

- Empire Indemnity Insurance Company;

- The Fidelity and Deposit Company of Maryland;

- Steadfast Insurance Company, Universal Underwriters Insurance Company;

- Universal Underwriters of Texas Insurance Company;

- Zurich American Insurance Company of Illinois; and

- Rural Community Insurance Company.

For each alternatively named Defendant, Plaintiff alleges that the Defendant was the primary payer, responsible for coverage of the medical treatments received by Plaintiff's MAO Assignor's beneficiaries. Therefore, as to each alternatively named Defendant, Plaintiff seeks damages based on that Defendant's failure to timely reimburse the MAO Assignor for conditional payments it made for its beneficiaries' accident-related medical expenses. Once Zurich identifies the proper entity(ies) within Zurich Insurance Group, Plaintiff will amend the Complaint accordingly.

## COUNT II
**Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A) for First-Party Claims**
**(Seeking the MAO Assignor's Unreimbursed Conditional Payments)**

124.     Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-109 as if fully set forth herein.

125.     Plaintiff asserts a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A).

126.     Zurich was the primary plan for the First-Party Claims.

127.     Zurich has a demonstrated responsibility to reimburse accident-related secondary payments relating to the First-Party Claims but failed to do so.

128.     With respect to the First Party Policy Claims, the MAO Assignor, while providing

44

Medicare benefits under the Medicare Advantage program, paid for accident-related medical items and services that were reasonable and necessary and that were also covered by no-fault, PIP, or MedPay policies issued by Zurich that provided medical coverage for accident-related medical expenses. The MAO Assignor's payments were conditional payments.

129. Zurich's responsibility to reimburse the MAO Assignor for its First Party Claims conditional payments is demonstrated by either the issuance of the policy providing coverage of the MAO Assignor's enrollees or by Zurich assuming ongoing responsibility for the medical expenses of the MAO Assignor's enrollee arising out of the accident.

130. Because Zurich was a primary payer—as established by the insurance policy or payment of one or more medical expenses or items—Zurich had a nondelegable duty with respect to the First Party Policy Claims to reimburse the MAO Assignor for accident-related medical expenses paid by the MAO Assignor.

131. Zurich was required to timely reimburse the MAO Assignor for conditional payments of its Medicare beneficiaries' accident-related medical expenses.

132. The MAO Assignor suffered damages as a direct result of Zurich's failure to comply with its statutory and regulatory duties under the MSP Act and the corresponding regulations within the Code of Federal Regulations.

133. Zurich derived substantial monetary benefit by placing the burden of financing medical treatments on the MAO Assignor in violation of the MSP Act and to the detriment of the Medicare program.

134. To the extent it was necessary, Zurich failed to administratively appeal the MAO Assignor's rights to reimbursement within the administrative remedies period. Zurich is, therefore, time-barred from challenging the propriety, reasonableness, and necessity of the amounts paid.

135. Plaintiff seeks to recoup only those medical items or services provided to the MAO Assignor's Medicare beneficiary enrollees that were related to motor vehicle accidents covered by Zurich's insurance policies.

136. Plaintiff brings this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A), for reimbursement of its MAO Assignor's secondary payments and to recover statutory double damages from Zurich for its failure to make appropriate and timely reimbursement of conditional payments for Medicare beneficiaries' accident-related medical expenses.

137. Further, due to Zurich's decision to have Zurich American Insurance Company report on behalf of subsidiaries, and other unclear reporting practices, Plaintiff alternatively brings this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A) to recover double damages from:

- American Guarantee & Liability Insurance Company;

- American Zurich Insurance Company;

- Colonial American Casualty and Surety Company;

- Empire Fire and Marine Insurance Company;

- Empire Indemnity Insurance Company;

- The Fidelity and Deposit Company of Maryland;

- Steadfast Insurance Company, Universal Underwriters Insurance Company;

- Universal Underwriters of Texas Insurance Company;

- Zurich American Insurance Company of Illinois; and

- Rural Community Insurance Company.

For each alternatively named Defendant, Plaintiff alleges that the Defendant was the primary payer, responsible for coverage of the medical treatments received by Plaintiff's MAO Assignor's beneficiaries. Therefore, as to each alternatively named Defendant, Plaintiff seeks damages based

on that Defendant's failure to timely reimburse the MAO Assignor for conditional payments it made for its beneficiaries' accident-related medical expenses. Once Zurich identifies the proper entity(ies) within Zurich Insurance Group, Plaintiff will amend the Complaint accordingly.

## COUNT III
### Breach of Contract for Failure to Pay Benefits for the Contractual Claims
### (Seeking the MAO Assignor's Unreimbursed Conditional Payments)

138. Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-109 as if fully set forth herein.

139. Plaintiff alleges certain claims here by way of subrogation.

140. At all material times, the MAO Assignor provided health insurance to Medicare beneficiaries, including those set forth in the examples above.

141. The MAO Assignor is subrogated to the right to recover from Zurich, in all instances in which Zurich is a primary plan, for Zurich's failure to make primary payment or reimbursement to the MAO Assignor for accident-related medical expenses.

142. The MAO Assignor paid for its enrolled Medicare beneficiaries' accident-related medical expenses in amounts to be proven at trial, pursuant to its agreements with CMS.

143. Zurich failed or refused to make primary payments of no-fault insurance benefits, or medical-payment benefits, as it was obligated to do.

144. Zurich's failure to pay or make timely reimbursement for the MAO Assignor's enrolled Medicare beneficiaries' accident-related medical expenses has caused the MAO Assignor damages, as set forth here, in amounts to be proven at trial.

145. To the extent necessary and not otherwise preempted by federal statute or regulation, Plaintiff complied with all applicable conditions precedent to the institution of this claim for reimbursement.

146.    For the First Party Claims, including those where Zurich issued policies in states where no-fault coverage is mandatory, as well as states where first-party medical coverage is optional, Zurich had a contractual obligation to pay benefits under a first-party policy that covered medical expenses.

147.    Further, due to Zurich's decision to have Zurich American Insurance Company report on behalf of subsidiaries, and other unclear reporting practices, Plaintiff alternatively brings this claim against:

- American Guarantee & Liability Insurance Company;
- American Zurich Insurance Company;
- Colonial American Casualty and Surety Company;
- Empire Fire and Marine Insurance Company;
- Empire Indemnity Insurance Company;
- The Fidelity and Deposit Company of Maryland;
- Steadfast Insurance Company, Universal Underwriters Insurance Company;
- Universal Underwriters of Texas Insurance Company;
- Zurich American Insurance Company of Illinois; and
- Rural Community Insurance Company.

**COUNT IV**
**Fraudulent Concealment**

148.    Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-109 as if fully set forth herein.

149.    As described above, Plaintiff and its MAO Assignor's ability to identify and recover secondary payments is only as good as Zurich's compliance with its duty to report its primary payer status, as required by federal law.

48

150.     Based on the claims information reported to CMS under Section 111, Plaintiff identified instances in which Zurich failed to properly reimburse on reported claims.

151.     In addition, on information and belief, Plaintiff alleges Zurich has not and cannot report all claims because it deliberately designed and operates a claim adjusting system that results in repeated, systematic failures to disclose its primary payer status for all first party policy claims and settlement claims as is its duty under the MSP Act and its implementing regulations.

152.     For all First-Party Policy claims and Settlement claims, Zurich's duty is to disclose information about its primary payer status to CMS, for the benefit of Medicare and, by extension, MAOs such as Plaintiff's MAO Assignor.

153.     Zurich's primary payer status and the fact it acted as the first-party insurer or settled a liability claim under a third-party policy are pieces of information known and/or accessible only to Zurich, because it possessed exclusive and/or superior knowledge as to such facts. Moreover, Zurich knew these facts were not known to or reasonably discoverable by Plaintiff or its MAO Assignor.

154.     By virtue of its repeated, systematic failure to report its primary payer status when it acted as the first-party insurer or settled a liability claim under a third-party policy, Zurich knowingly and/or recklessly concealed this information breaching the duty prescribed to it under the MSP Act and its implementing regulations.

155.     Zurich's knowing and/or reckless concealment of its primary payer status by means of failure to report under Section 111 is a breach of duty separate and distinct from its failure to properly reimburse under the MSP Act and its implementing regulations.

156.     Plaintiff and its MAO assignor were unaware of the concealed material facts relating to Zurich's primary payer status for unreported First Party Policy and Settlement Claims

and Plaintiff and its MAO Assignor would not have acted as they did if they had known Zurich was a primary payer for the unreported First Party Policy and Settlement Claims.

157. Specifically, Plaintiff's MAO Assignor would not have made any secondary payments if Zurich had properly disclosed its primary payer status before Plaintiff's MAO Assignor paid. Moreover, Plaintiff would have timely pursued reimbursement against Zurich, through issuance of a demand letter, had Zurich not concealed its primary payer status from Plaintiff and its MAO Assignor. Plaintiff through its MAO Assignor justifiably relied on the absence of a Section 111 report when making secondary payments on the unreported first party policy and settlement claims.

158. Because the omission of the material fact that Zurich was a primary payer for the unreported First Party Policy and Settlement Claims, Plaintiff and its MAO Assignor sustained damages when the MAO Assignor paid for items and services that were the responsibility of Zurich. Had Plaintiff and its MAO Assignor known of the facts Zurich knowingly and/or recklessly concealed, Plaintiff's MAO Assignor would not have paid for items and services that were the responsibility of Zurich. In addition, even in instances where Plaintiff's MAO Assignor made such payments, Plaintiff would have timely pursued reimbursement against Zurich.

**COUNT V**
**Declaratory Relief Pursuant to 28 U.S.C. § 2201**
**(As Related to the MAO Assignor's Unreimbursed Payments)**

159. Plaintiff re-alleges and incorporates by reference each of the allegations contained in the preceding paragraphs 1-109 as if fully set forth here.

160. Zurich is required to identify and coordinate benefits relating to any secondary payments that the MAO Assignor made. Zurich, however, has refused to disclose important information relating to claims made under first-party policies. Zurich has taken the position that it

has no obligation to identify, much less coordinate, with Plaintiff's MAO Assignor unless certain conditions are met under certain state no-fault statutes, including those set forth above. This position has caused and will cause a bona fide present controversy between the parties concerning Zurich's obligations under the MSP Act.

161.    Specifically, there is a bona fide, actual, present, and practical need among the parties for a judicial declaration that:

a.    Zurich must determine whether its insureds are also covered by the MAO Assignor, and if so, then, Zurich must coordinate benefits with the MAO;

b.    Zurich must alert the MAO Assignor of Zurich's primary payer obligations;

c.    Unlike healthcare providers lawfully rendering treatment to an injured person for bodily injury covered by PIP insurance, the MAO Assignor is not obligated to submit a demand for reimbursement on a properly completed 1500 Claim Form, UB 92 Form, or any other standard form under any relevant no-fault statute; and

d.    Secondary Payers are not obligated to comply with the strict requirements of any applicable no-fault statute, when seeking reimbursement demands and that:

i.    Zurich must notify the MAO of the name of the insured upon which such benefits are primary;

ii.    the MAO is not required to provide a standard "assignment" typically given to providers by insureds; and

iii.    Zurich must notify the MAO of the claim number or policy number upon which such claim was originally submitted to Zurich.

162.    The determination of what amounts are owed by Zurich to Plaintiff's MAO Assignor is complicated and difficult.

163.    A coordination-of-benefits process requires plans to share information between the primary payer and secondary plan and to act in good faith.

164.    The Code of Federal Regulations defines the coordination of benefits system as a "coordination of benefits transaction."[16]

165.    The coordination of benefits transaction involves the exchange of thousands of claims data and data points between the parties to determine overlapping instances where Plaintiff's MAO Assignor made payment of medical items and services on behalf of a Medicare beneficiary who was entitled to the benefit of insurance coverage provided by Zurich. This includes not only instances in which a Medicare beneficiary was directly insured by Zurich, but also instances in which a Medicare beneficiary was injured by a third party insured by a Zurich policy or falling under the Medicare beneficiary's UM/UIM Zurich coverage.

166.    The exchange of claims data may be accomplished by extracting and producing certain data fields from Zurich's and Plaintiff's databases by using demographic identifiers, such as Social Security Number ("SSN"), Health Insurance Claim Number ("HICN"),[17] date of birth, sex, and address. Beneficiary matching pinpoints the number of relevant insureds and simplifies the process of identifying reimbursable claims, which is done by matching the date of loss (for Zurich), with dates of payment (for Plaintiff), and then discovering what Zurich reimbursed (if anything), and to whom.

167.    Given the magnitude of the claims and data points being exchanged between the parties, the coordination of benefits transaction is complex.

---

[16] The "coordination of benefits transaction" is the transmission from any entity to a health plan for the purpose of determining the relative payment responsibilities of the health plan, of either of the following for health care: (a) claims and (b) payment information. 45 C.F.R. § 162.1801.

[17] Also known as a Medicare Beneficiary Identifier ("MBI").

168. Thus, Plaintiff lacks an adequate legal remedy to obtain the requested information.

169. Due to Zurich's decision to have Zurich American Insurance Company report on behalf of subsidiaries, and other unclear reporting practices, Plaintiff is unable to determine precisely which Zurich entity, or entities, failed to reimburse and coordinate benefits with the MAO Assignor. Therefore, Plaintiff pleads in the alternative, seeking a declaratory judgment against:

- American Guarantee & Liability Insurance Company;

- American Zurich Insurance Company;

- Colonial American Casualty and Surety Company;

- Empire Fire and Marine Insurance Company;

- Empire Indemnity Insurance Company;

- The Fidelity and Deposit Company of Maryland;

- Steadfast Insurance Company, Universal Underwriters Insurance Company;

- Universal Underwriters of Texas Insurance Company;

- Zurich American Insurance Company of Illinois; and

- Rural Community Insurance Company.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all of the triable issues.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment granting the following relief:

A. A judgment for any secondary payments made by Plaintiff's MAO Assignor which Zurich should have paid based on its primary payer status for First Party Policy Claims and Settlement Claims.

B.    A judgment awarding double damages for those amounts to which Plaintiff is entitled to reimbursement as allowed under 42 U.S.C. § 1395y(b)(3)(A);

C.    In the alternative, a declaratory judgment for the relief requested in Count V;

D.    A judgment awarding Plaintiff pre-judgment and post-judgment interest; and

E.    Attorneys' fees as may be allowed under any applicable law;

F.    Tolling any applicable statute of limitations for First Party Policy Claims and Settlement Claims Zurich was under a duty to report pursuant to Section 111 but concealed by means of its failure to properly report;

G.    A judgment awarding Plaintiff such other and further relief as the Court deems just and proper under the circumstances.

Dated: November 27, 2023.

Respectfully submitted,

/s/ Jarret Raab
Jarret Raab, Esq.
ARDC No.: 6294632
Mark E. Silvey, Esq.*
TN Bar No.: 013415
Justin G. Day, Esq.*
TN Bar No.: 33267
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
227 W. Monroe Street, Suite 2100
Chicago, IL 60606

*Pro Hac Vice Motion Forthcoming*